OPINION OF THE COURT
John Marmarellis, J.
An obvious advantage of our highly developed technology is the availability of complex machinery to alleviate the otherwise burdensome tasks of compiling and returning masses of information. However, the beneficial effects of our computers become illusory when their functioning goes awry.
This is a case involving an electronic fund transfer system and what is commonly referred to as a “cash machine”. Plaintiff sues for the return of $800 which she claims was erroneously charged to her account by defendant. Defendant asserts that said funds were withdrawn at a “cash machine” by either plaintiff or someone authorized by her to do so.
Plaintiff and her husband hold a joint checking account at a Citibank branch and were each issued a “Citicard” — a plastic card similar to a credit card which *527 provides access to a computer, at which cash withdrawals can be made by the customer. No bank teller is required for this transaction. However, a card cannot provide access to the computer unless it has been validated by the bank; in this instance only plaintiff’s card was validated. In addition, at the time of validation the customer chooses a “personal identification code” (p.i.e.) which is known only to the customer. According to the testimony of a bank branch manager, only the customer knows this number — not only is it known only to the customer, but it is impossible for anyone to retrieve it from the computer, including employees of the bank. The testimony further indicated that unless the p.i.e. is entered into the computer shortly after the system is activated by insertion of the Citicard, a cash withdrawal cannot be made.
From the testimony adduced at trial it appears that the funds in question were withdrawn from plaintiff’s account on February 26, 1980 between 2:13 and 2:14 P.M., and on March 28, 1980 between 2:30 and 2:32 p.m. Plaintiff testified and produced a letter from her employer to the effect that she was at work on both occasions and could not have made the said withdrawals. Citibank produced computer printouts documenting the withdrawals in issue, which printouts were explained (translated) by the bank’s witness, the branch manager. Defendant asserts that the funds in question were and could only have been withdrawn from the Judd account by use of a validated Citicard at a Citibank electronic teller, coupled with entry of the correct p.i.e. Citibank has submitted a statement in support of its contention that it has effected stringent security measures to prevent the unauthorized use of Citicards. Plaintiff testified that not only did she not let anyone else use her Citicard but that she never told anyone her p.i.e. and never even wrote it down.
The question presented is a basic one, of evidence, burdens and credibility: Has plaintiff proven her case by a fair preponderance of the credible evidence? In this case we are met with a credible witness on the one hand and a computer printout on the other. It is evident that *528 there was no opportunity to cross-examine the computer or the printout it produced. However, the court was benefited to some extent by the testimony of the Citibank branch manager referred to above. Although not qualified as an expert in computer systems, he was familiar with the read-outs provided by the Citibank cash machines. The question then becomes, who (or what) to believe, the person or the machine?
In 1974 Congress established the National Commission on Electronic Fund Transfers (the Commission) (US Code, tit 12, § 2401). The Commission was to “conduct a thorough study and investigation and recommend appropriate administrative action and legislation necessary in connection with the possible development of public or private electronic fund transfer systems, taking into account, among other things * * * (9) the need to protect the legal rights of users and consumers” (US Code, tit 12, § 2403). On October 28, 1977 the Commission issued its final report. Several of the recommendations contained in that report involved a shifting of the burden of proof; this court cites those recommendations with approval. For example, at page 58 of the Final Report of the Commission:
“To protect EFT account holders from incurring any liability when they have not been negligent and to protect the account holder from vague negligence standards, the Commission recommends that the following four provisions be enacted as Federal Legislation:
“1. An EFT account holder should have no liability for an unauthorized use of his account unless the depository institution can prove, without benefit of inference or presumption, that the account holder’s negligence substantially contributed to the unauthorized use and that the depository institution exercised reasonable care to prevent the loss. Negligence in this instance should be limited to writing the PIN on the card, keeping the PIN with the card, or voluntarily permitting the account accessing devices, such as the PIN and the card, to come into the possession of a person who makes or causes to be made an unauthorized use”.
*529 At page 61, “The Congress should enact an error resolution procedure for consumer EFT accounts that will resolve error allegations within a reasonably short, yet realistic, time frame. This procedure should be capable of minimizing those occasions when a depositor is deprived of funds because of a dispute with his depository institution over an alleged unauthorized access to his account. The Commission therefore recommends that: * * *
“5. If the depository institution denies the alleged error or its responsibility for the error or unauthorized use, the customer should have the burden of initiating any further proceeding, such as a lawsuit, to establish his right to have his account credited or recredited. Once a lawsuit has been initiated by a depositor, the depository institution has the burden to prove that there was no error or unauthorized use for which it was responsible.”
The report adds: “Once a law suit over an unauthorized use has been initiated by a depositor, the depository institution must prove that the account holder’s negligence substantially contributed to the unauthorized use in one of three specified ways. Additionally, the depository institution must prove that it exercised reasonable care to prevent the loss * * * Alternatively, the depository institution may attempt to prove that the depositor’s claim of unauthorized use is fraudulent.”
Although the recommendations of the Commission are just that and not law, they do provide a valuable guide to steps that may be taken to reduce the danger of overreliance on the accuracy of computer systems. The court looks forward to legislation dealing with the issues raised and recommendations made by the Commission in its final report.
While not applying the recommendations of the Commission, this court is not prepared to go so far as to rule that where a credible witness is faced with the adverse “testimony” of a machine, he is as a matter of law faced also with an unmeetable burden of proof. It is too commonplace in our society that when faced with the choice of man or machine we readily accept the “word” of the *530 machine every time. This, despite the tales of computer malfunctions that we hear daily. Defendant’s own witness testified to physical malfunctions of the very system in issue.
This court, as trier of the fact, finds that plaintiff has proven her case by a fair preponderance of the credible evidence. Accordingly, judgment is awarded to plaintiff in the amount of $800 plus interest and disbursements.